Filed 6/30/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C067436 |
| v. | (Super. Ct. No. 08F09401) |
| VICTOR TYRONE GARRETT, | |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C069886 |
| v. | (Super. Ct. No. 08F09401) |
| ERION DEMONTA VARNADO, | |
| Defendant and Appellant. | |

APPEALS from judgments of the Superior Court of Sacramento County, Laurie M. Earl and James P. Arguelles, Judges. Reversed in part and affirmed in part.

Barbara Michel, under appointment by the Court of Appeal, for Victor Tyrone Garrett, Defendant and Appellant.

---

[*]    Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I through VII of the discussion.

1

Victor J. Morse, under appointment by the Court of Appeal, for Erion Demonta Varnado, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Charles A. French, Craig S. Meyers and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

In November 2008, defendants Victor Tyrone Garrett and Erion Demonta Varnado participated in armed robberies and an attempted armed robbery.[1] Both Garrett and Varnado were 17 years old when the offenses were committed, but were tried as adults. (Welf. & Inst. Code, § 707, subds. (b)(3) & (c).)

A jury convicted Garrett of six counts of second degree robbery (Pen. Code, § 211),[2] two counts of kidnapping for robbery (§ 209, subd. (b)(1)), one count of attempted robbery (§§ 211/664), and one count of assault with a firearm (§ 245, subd. (a)(2)). For each of the offenses, the jury found true the allegation Garrett personally used a firearm (§ 12022.53, subd. (b)), and as to the assault with a firearm that Garrett personally discharged a firearm. (§ 12022.53, subd. (c).) Garrett was sentenced to serve a total of 74 years and 4 months to life in prison.

Varnado was also convicted by a jury of two counts of second degree robbery, one count of attempted robbery, and one count of assault with a firearm. The jury also found true the allegation Varnado personally used a firearm during the assault and attempted robbery. However, the jury found Varnado not guilty of four counts of robbery. The jury was unable to reach a verdict as to the two counts of kidnapping to commit robbery, the allegation Varnado personally used a firearm during the second degree robberies, or he

---

[1]    Garrett and Varnado were charged along with Antwaan Edwardo Anderson and Vance Hicks. Anderson pled guilty before trial, and Hicks admitted his guilt after trial commenced. Neither Anderson nor Hicks is a party in this appeal.

[2]    Undesignated statutory references are to the Penal Code.

2

discharged a firearm during the attempted robbery. The trial court declared a mistrial as to the counts and enhancements for which the jury could not reach a verdict.

On retrial, Varnado was convicted of the remaining two counts of second degree robbery, and the jury found true the allegation he used a firearm during these robberies. The second jury was not asked to decide whether Varnado discharged a firearm during the attempted robbery. Varnado was sentenced to serve a total of 31 years to life in prison.

On appeal, both defendants contend (1) the evidence of asportation was insufficient to support their convictions of kidnapping for robbery. In a related argument, Varnado contends (2) the trial court erred in refusing defense counsel's proposed instruction informing the jury that "incidental" movement does not amount to kidnapping for robbery.

Varnado further argues (3) evidence regarding the firing of a gun during the attempted robbery was improperly admitted during his retrial to prove he used a gun on a separate occasion, (4) insufficient evidence of intent to commit theft requires reversal of his attempted robbery conviction, and (5) an unduly suggestive identification procedure was used to identify him two days after the robbery.

Garrett separately argues that (6) an in-field show up employed by the police shortly after his arrest was an unduly suggestive identification procedure, (7) his *Miranda* rights were violated during his interrogation by the police,[3] and (8) his prison sentence of 74 years and 4 months to life constitutes cruel and unusual punishment because he was a minor at the time of the offenses.

We conclude the defendants' act of moving the victims of kidnapping for robbery from where they were standing into the locked trunk of a car sufficed for the asportation requirement of the offense. Contrary to Varnado's contention, the trial court was not

---

[3]     See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694; 86 S.Ct. 1602].

required to give defense counsel's proposed pinpoint instruction. We also find no error in the admission of testimony regarding the discharge of a firearm during the attempted robbery. The evidence was sufficient to establish intent to commit robbery during the attempted robbery. And, the police did not use an unduly suggestive identification procedure two days after Varnado's arrest.

As to Garrett's separate claims, the in-field show up did not constitute an unduly suggestive identification procedure. And, the police did not violate his Fifth Amendment rights because Garrett knowingly and voluntarily waived his rights after being given a *Miranda* advisement. However, we conclude Garrett's sentence of 74 years and 4 months to life in state prison requires remand for resentencing under the guidance of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).

Accordingly, we affirm the judgment as to Varnado. We affirm Garrett's convictions, but reverse and remand for resentencing.

BACKGROUND

### *Robberies of Kilgore, Cheatham, Douglas, and Cordero* (*Counts 1-4*)

At approximately 9:00 p.m. on November 15, 2008, Jaquan Cheatham and Lonnie Kilgore were walking to a 7-Eleven store. Two males with guns approached Cheatham and instructed him to empty his pockets. Cheatham heard the cocking of a gun and turned over his school identification and telephone. Cheatham gave the robbers his pants so they would know he had turned over everything. Kilgore also took off clothing and handed it to the robbers.

Thomas Douglas and Alexis Cordero were nearby and watched Cheatham and Kilgore get robbed. Cordero explained she initially saw a black car with three male occupants. Cordero then "had a bad feeling" and turned around to see two of the males "attack" a boy behind her. The robbers brandished guns and took everything from the boy –- even his clothes.

4

Fearing the robbers would attack her group too, Cordero told her friends to run away. Cordero and Douglas hid behind a nearby van. When the same black car drove by, Cordero heard someone from the car tell them to come out from behind the van. Cordero and Douglas did so with their hands up. One of the robbers instructed, "Lean up against the garage and give us everything that you have." The same two robbers that had attacked the boy appeared with guns drawn and took Cordero's shoes, jacket, money, cell phone, and chain. Douglas gave the robbers his necklace and wallet.

At approximately 3:00 a.m. on November 28, 2008, Sacramento County Sheriff's Deputy Michael Putnam drove Cheatham, Kilgore, Areél Robinson, and Markeisha DeMyers to view suspects who had been arrested in Elk Grove. Although Detective Mark Bearor at the Elk Grove Police Department planned to line the witnesses up in a hallway face-to-face with the suspects, the witnesses refused the proposed procedure. Instead, the four witnesses observed the suspects from a patio area through a plate glass window at a distance of 15 to 25 feet. Deputy Putnam led the witnesses, one at a time, to the patio area where they viewed the suspects.

As to the defendants in this appeal, Cheatham stated with certainty Varnado was one of the males who robbed him. However, Cheatham was not able to identify Garrett. DeMyers identified Varnado but not Garrett. The record does not indicate what identifications, if any, were made by Kilgore or Robinson.

### *Kidnapping for Robbery of Gutierrez and Gribben (Counts 5-8)*

Abel Gutierrez and Sheila Gribben went on their first date together on November 18, 2008. Shortly after midnight on November 19, 2008, they returned from the movies to Gribben's apartment complex in Sacramento. They talked next to Gutierrez's car for approximately 30 minutes when he noticed a champagne color car with four males wearing black sweaters. Gutierrez mentioned to Gribben that "something wasn't right." Gutierrez lost sight of the car behind a hill, but soon saw the four occupants walking by him and Gribben. One of the males pointed a long, silver

5

revolver at Gutierrez's head and instructed him to take off his clothes. Gutierrez refused and was then told to empty his pockets. Eventually, Gutierrez took out his cell phone, wallet, and keys, and handed them over. The male with the gun then patted Gutierrez down to see if he had turned over everything. Gutierrez was then told to hand over the pea coat he was wearing.

The robbers then told Gutierrez to sit down on a curb. While Gutierrez watched, the males took some earrings and keys from Gribben. Gutierrez told them to let Gribben go. The male with braids in his hair responded, "She's not going anywhere." Gribben complied with an instruction to sit next to Gutierrez on the curb.

The robbers took Gutierrez's keys and attempted to open the trunk of his car. Unable to do so, they told Gutierrez to unlock his trunk. Gutierrez unlocked the trunk by pushing a button inside the passenger compartment. The robbers told Gutierrez to give them the subwoofer speakers he had in the trunk. But Gutierrez explained they could not easily be removed because they were wired to the car. The male with braids responded, "We'll just take the whole damn car." He then told Gutierrez to get into the trunk.

Gutierrez feared the males would end up killing them if he and Gribben got into the trunk. Hoping to avoid getting into the trunk, Gutierrez told them "just to take off and leave, that they had taken everything we had and weren't going to do anything; that if we were going to try anything we would have done that before any of that had happened." The male with braids responded, "Are you trying to die tonight?" The males called Gribben over and put her into the trunk with Gutierrez. They slammed the trunk twice on Gutierrez's head when trying to close it and succeeded in closing it on the third try. Gutierrez worried they would not be able to get out.

Gutierrez and Gribben heard the robbers rummaging through the car for a few minutes before they left. Gribben began to panic and Gutierrez tried to calm her down. After hearing the robbers run away, Gutierrez and Gribben waited for a few minutes before Gutierrez began to tear away the lining of the trunk. Gutierrez and Gribben

6

shouted for help. Approximately 5 to 10 minutes later, Gribben's housemate let them out and called the police. Gutierrez discovered an iPod and headphones had been taken from the interior of the car. Gribben's watch and camera also had been taken.

Several hours later, Sacramento Police Officer Wesley Nezik received word a vehicle matching the descriptions given by Gutierrez and Gribben had been located. Officer Nezik contacted Gutierrez and Gribben and transported them to the Elk Grove area where the vehicle had been found. Gutierrez immediately recognized the car as the one in which he had seen the robbers. Gutierrez and Gribben also recognized items stolen from them.

Officer Nezik then drove Gutierrez and Gribben to an in-field show up at the Elk Grove Police Department. Officer Nezik testified: "[O]n the way to the police department, I explained to them that there were people who were being detained. They may or may not be related to their situation from the previous robbery that happened there. They may or may not be in handcuffs. If they are, it's for our safety and for theirs." At the police station, Gutierrez and Gribben were escorted inside but indicated they were scared about the prospect of meeting the robbers face to face. Officer Nezik led them outside and allowed them to sit in the backseat of the patrol vehicle. The officer testified it was not "an ideal way to do it" but he was the only police officer available to do a field show-up. The patrol car lights were turned on and the suspects were brought into the light one at a time. Given the unusual nature of the field show-up, Officer Nezik instructed Gutierrez and Gribben not to discuss the suspects between themselves. The victims agreed.

As to the defendants in this appeal, Gribben stated about Varnado that he had "a similar haircut" to one of the robbers. By contrast, Gutierrez "stated that he did recognize the hair [on Varnado] because it was very distinct because the braids were sticking up in the air." Neither Gutierrez nor Gribben recognized the second suspect, Vance Hicks. When Anderson was brought out, Gribben stated: "That's him. He was

7

the one pointing the gun at me demanding my stuff" and one of the males who told them to get into the trunk. Gutierrez also "seemed very confident" in identifying Anderson. When Garrett was brought out, Gribben was "not sure about him." Gutierrez said Garrett "looked familiar and that someone there on scene was wearing . . . similar clothing."

### *Assault and Attempted Robbery of Mangano* (*Counts 9-10*)

Early in the morning on November 18, 2008, John Mangano delivered newspapers by car in Elk Grove. Mangano had just gotten back into his vehicle when a "silverfish color" car pulled diagonally in front of his car "and blocked [him] off." Mangano noticed three doors open and three males got out of the car. Mangano asked, "Well, what's going on?" He then observed the male behind the driver holding a black revolver at waist level. Mangano threw his car into reverse, ducked down, and began to drive away. Before he ducked, Mangano caught a glimpse of four males from the car.

Mangano had driven approximately 20 to 25 feet when he heard a gunshot. When Mangano next looked up, he saw two of the males were holding guns "like in the gangster movies" and heard additional shots ring out. Once Mangano had gotten 40 yards away, he looked up again and saw the males get back into their car. As the car drove away on Elk Grove Boulevard, Mangano decided to follow it. While following the car, Mangano called the police with his cell phone. Elk Grove Police Officers Shane Glaser and Robert Barnes responded to the call in their patrol cars. Matching the description of the suspect vehicle and location was a gray, four-door Pontiac Grand Am. The officers pulled the car over and arrested the four occupants: Varnado, Garrett, Hicks, and Anderson.

A search of the suspect vehicle turned up two handguns, four spent casings, an iPod, headphones, four cell phones, keys, and a purple digital camera, several purses, and a black jacket.

After his arrest, Garrett was interviewed by the police. Garrett admitted he was riding with Varnado, Hicks, and Anderson. Along with him, Garrett had a gun he had

8

stolen from his grandfather a few weeks earlier. Garrett's hands were tested for gunshot residue. The test indicated Garrett had recently "fired a weapon, was near a weapon when it was fired, or handled a fired weapon or fired ammunition."

### *Defense Evidence*

Garrett introduced evidence he was at his house on the evening of November 15, 2008, when Kilgore, Cheatham, Douglas, and Cordero were robbed. Garrett's sister, Victoria Garrett, testified he had been present the entire time at a family barbecue that lasted until 1:00 or 2:00 in the morning. This testimony was corroborated by a friend of Garrett's and by a neighbor who testified Garrett had been present at the barbecue.

Varnado introduced the testimony of Dr. William Shomer, an expert on witness identification, perception, and memory. Dr. Shomer testified that (1) "people are highly unreliable with respect to cognition of strangers," (2) people overestimate their certainty of identification when suspects have similar appearances, (3) cross-racial identifications tend to be "far less accurate" (4) the stress of being assaulted by a weapon has an adverse affect on the ability to remember accurately, and (5) the identification procedure employed can make a significant difference in outcomes.

### *Varnado's Retrial*

Varnado was retried after the first jury was unable to reach a verdict on the counts of kidnapping for robbery against Gutierrez and Gribben or on the allegations of personal firearm use against Gutierrez and Gribben. As pertinent to the issues raised on appeal by Varnado, the evidence at the second trial showed the robbers made Gribben sit on the curb about 10 feet from Gutierrez's car during the robbery. Gutierrez did not sit, but stood next to Gribben. According to Gribben, the robbers did not move them to the curb. Instead, Gribben and Gutierrez were already standing there when the robbery started.

The robbers told Gutierrez to open his car trunk. When the robbers saw the subwoofer speakers inside they tried to remove them, but were unsuccessful. They debated stealing the car. The robbers then told Gutierrez to get into the trunk. The

robbers then instructed Gribben to get up from the curb and climb into the trunk with Gutierrez. The robbers twice slammed the trunk onto Gutierrez's head before they were able to close the trunk.

DISCUSSION

# I

## *Garrett and Varnado's Arguments Regarding Insufficiency of the Evidence Regarding Kidnapping for Robbery*

Garrett and Varnado contend the evidence was insufficient to convict them of kidnapping for robbery because of the insignificant distance Gutierrez and Gribben were moved during the robbery. Specifically, Garrett and Varnado argue the asportation requirement of kidnapping for robbery was not met for either victim. We disagree.

## A.

### *Standard of Review*

The standard of review for insufficiency of the evidence is well established. In reviewing a claim of evidentiary insufficiency, we "view the evidence in the light most favorable to the judgment and must presume in support of that judgment every fact that the trier of fact could reasonably deduce from the evidence. [Citations.] To survive an insufficiency of evidence challenge, the evidence must be substantial enough to support the finding of each essential element of the crime and special circumstance. Substantial evidence is that which is reasonable, credible and of solid value. The trier of fact weighs the evidence presented, resolves conflicts in the testimony and draws reasonable inferences from the facts before it. If its findings are reasonable and supported by the evidence, reversal of the conviction or of the special circumstances finding is not warranted even if a contrary finding might also be reasonable." (*People v. Johnson* (1992) 5 Cal.App.4th 552, 558; accord *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

**B.**

*Evidence of the Victims' Movement*

Although labeled by Garrett and Varnado as insufficiency of the evidence arguments, the gravamen of their contentions is this:  the short distance the robbers moved Gutierrez and Gribben from the curb to the inside of the car trunk was insufficient as a matter of law to sustain a conviction of kidnapping for robbery.  Neither Garrett nor Varnado disputes they moved Gutierrez and Gribben from where they were standing near the car, made the victims get into the trunk of the car, and then closed the trunk to lock the victims inside.[4]  Instead, Garrett and Varnado contend the distance involved in Gutierrez's and Gribben's robbery was too short as a matter of law to meet the minimum requirements of the asportation element of kidnapping for robbery.

Even though Varnado's conviction for two counts of kidnapping for robbery rests on the evidence presented at his retrial, he does not point to any meaningful difference on this issue between the evidence presented at the first trial –- which resulted in Garrett's conviction on the two counts of kidnapping for robbery –- and that presented at the second trial in which Varnado was convicted.  Our review of both trials shows consistency in that the robbers moved Gutierrez and Gribben from the nearby curb to the rear of the car, had them get into the trunk, and then closed them inside.

**C.**

*Kidnapping for Purposes of Robbery (§ 209, subd. (b)(1))*

Subdivision (a) of section 207 defines kidnapping as follows:  "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or

---

[4]     Although the testimony at Varnado's retrial indicated the robbers moved Gribben approximately 5 to 10 feet from the curb to the trunk of the vehicle, the testimony at Garrett's trial does not indicate the distances involved except to note Gutierrez and Gribben were moved from where they were standing/sitting into the trunk.

11

county, or into another part of the same county, is guilty of kidnapping." As the California Supreme Court recently noted, "Section 209, subdivision (b)(1) prescribes greater punishment for aggravated kidnapping where the accused 'kidnaps or carries away any individual to commit robbery. . . .' Kidnapping for robbery requires asportation, i.e., movement of the victim that is not merely incidental to the commission of the robbery and that increases the risk of harm over that necessarily present in the crime of robbery itself. (§ 209, subd. (b)(2); *People v. Rayford* (1994) 9 Cal.4th 1, 12.)" (*People v. Delgado* (2013) 56 Cal.4th 480, 487.)

The test for whether the movement of the victim suffices for a kidnapping for robbery conviction was articulated in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*). In *Daniels*, "the court concluded that . . . section 209 not only excluded 'standstill' robberies from its scope, 'but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself.' (*Daniels, supra*, 71 Cal.2d at p. 1139.) In other words, *Daniels* 'construed [the aggravated kidnapping statute] to preclude convictions based on movement of the victim that is criminologically insignificant.' " (*In re Crumpton* (1973) 9 Cal.3d 463, 466.)

Determining whether the evidence showed sufficient asportation for kidnapping for robbery requires two considerations: "First, ' "[i]n determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement. [Citation.] This includes the actual distance a victim is moved. However, . . . there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.' [Citations.]" [Citations.]' (*People v. Washington* (2005) 127 Cal.App.4th 290, 297.) 'Incidental' means 'that the asportation play no significant or substantial part in the planned [offense], or that it be a more or less " 'trivial change[] of location having no bearing on the evil at hand.' " ' (*People v. Ellis* (1971) 15 Cal.App.3d 66, 70.) ' " 'The second prong of the *Daniels* test refers to whether

the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. [Citations.]' [Citations.]" [Citation.]' (*People v. Washington, supra*, 127 Cal.App.4th at p. 297.) The two elements of the test are related; 'whether the victim's forced movement was merely incidental to the [underlying offense] is necessarily connected to whether it substantially increased the risk to the victim.' (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.) '[E]ach case must be considered in the context of the totality of its circumstances.' (*Ibid*.)" (*People v. James* (2007) 148 Cal.App.4th 446, 453-454.)

## D.

### *The Movement of the Victims into the Trunk of the Car Sufficed*

As to Gutierrez, we conclude the robbers' moving him from the curb to the car was incidental to the robbery. Gutierrez had been standing at the curb when the robbers tried unsuccessfully to open the trunk of his car. When the robbers told Gutierrez to open the trunk, he went to the car and complied. The robbers attempted to take the subwoofer speakers from the trunk. However, Gutierrez told them they could not be easily removed because they were wired to the car. Up to this point, the robbers moved Gutierrez to facilitate their theft of property from Gutierrez and his car. Consequently, the distance Gutierrez traveled from the curb to his car and movement around his vehicle does not accrue to the asportation requirement of kidnapping for robbery. (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1152.)

However, the robbers' act of forcing Gutierrez to get into the trunk was not incidental to the robbery. As Gutierrez told the robbers at the time, they had taken everything from him and Gribben without resistance. Placing Gutierrez into the trunk did

13

not enable the robbers to take anything. Consequently, we must consider whether moving and locking Gutierrez into the trunk of his car constituted sufficient movement to meet the asportation requirement of kidnapping for robbery.

The distance from outside the trunk to its interior was not far. However, the California Supreme Court has made clear that kidnapping for robbery requires no minimum distance a defendant must move a victim. (*People v. Vines* (2011) 51 Cal.4th 830, 870.) Thus, we proceed to consider the additional factors informing the test for sufficient asportation. (*Daniels, supra,* 71 Cal.2d at p. 1139.) On balance, these factors lead us to conclude the evidence was sufficient to convict Garrett and Varnado of kidnap for robbery. Moving Gutierrez and Gribben into the trunk and locking them inside increased the risks of harm beyond the risks of armed robbery. Even aside from the fact Gutierrez was actually hurt when the robbers twice slammed the trunk on his head, the confinement increased the risks to both victims. Gutierrez feared getting inside the trunk because he thought the robbers would kill him if he complied. This fear is understandable because the robbers could have driven the victims to a remote location where additional crimes would likely have gone unobserved. Gutierrez had to destroy part of his car before he could yell for help. Thus, moving the victims into the locked trunk substantially increased the risks to Gutierrez and Gribben that arose from concealment, physical confinement, and sound insulation.

Conversely, the robbers enhanced their opportunity to commit additional crimes by locking the victims into the trunk of a car to which the robbers had the keys. Thus, the robbers facilitated additional thefts from Gutierrez's car and increased their chances of evading notice when departing the crime scene.

Inside the locked trunk, the victims were subjected to enhanced risks even if the car remained stationary. Such risks included possible injury due to attempts to break out and adverse conditions of deprivation if they had failed to escape. Gribben panicked while in the trunk. She testified she thought to herself: "I was going to die." Locking

14

Gutierrez and Gribben inside the trunk decreased the likelihood of detection. Moreover, the robbers restrained the victims in a space from which they were unable to escape by themselves. Gutierrez and Gribben were freed only after a friend happened to hear them banging and yelling after she had turned off her television.

By moving Gutierrez and Gribben into the trunk of the car, the robbers sufficiently increased the risks to the victims that the movement satisfied the asportation requirement of kidnapping for robbery. We conclude the evidence supported Garrett and Varnado's convictions of kidnapping for robbery.

## II

### *Varnado's Request for a Pinpoint Instruction on Movement Necessary for Kidnapping for Robbery*

In a challenge related to the claim the evidence was insufficient to sustain the kidnapping for robbery convictions, Varnado contends the trial court erred in refusing his request to instruct the jury that movement of a victim can be merely incidental to the robbery even if the movement is not necessary for the robbery. We conclude the trial court did not err in refusing to give this instruction.

### A.

### *Jury Instructions Given on Kidnapping for Robbery*

During Varnado's retrial, the court instructed jurors on kidnapping for robbery by giving CALCRIM No. 1203. As to the count alleged for the offense against Gribben, the trial court instructed:

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit robbery; [¶] 2. Acting with that intent, the defendant took, held, or detained Sheila Gribben by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved Sheila Gribben or made Sheila Gribben move a substantial distance; [¶] 4. Sheila Gribben was moved or made to move a distance beyond that merely incidental to the commission of a robbery; [¶] 5. When that movement began, the defendant already intended to commit robbery,

15

and [¶] 6. Sheila Gribben did not consent to the movement. [¶] As used here, substantial distance means more than a slight or trivial distance. The movement must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement."

The trial court used the same instruction for the additional count of kidnapping for robbery, substituting only Gutierrez's name for Gribben's.

In instructing the jury with CALCRIM No. 1203, the trial court rejected a request by defense counsel for a pinpoint instruction as follows: "Movement can be incidental to the robbery, even if the movement is not necessary for the robbery." As the trial court noted, the defense drew the language of the requested pinpoint instruction from the case of *People v. Hoard* (2002) 103 Cal.App.4th 599. The trial court refused to give the pinpoint instruction, questioning the continuing validity of *Hoard* and finding it would confuse the jury.

## B.

### *Pinpoint Instructions Need Not be Given when Redundant to Other Instructions*

" 'A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case.' (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) Specifically, a criminal defendant 'is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt. . . .' (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) But where standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 856-857.) Thus, "[w]e bear in mind that ' " ' "[w]hether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." ' " ' (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1027.)" (*People v. Hughes* (2002) 27 Cal.4th 287, 360.)

16

## C.

### *Varnado's Proposed Pinpoint Instruction*

We agree with the trial court that the pinpoint instruction requested by Varnado's trial counsel was redundant and confusing. First, the proposed pinpoint instruction merely advised the jury not every movement of a robbery victim would necessarily turn the crime into kidnapping for robbery. CALCRIM No. 1203, as given here, sufficiently informed the jury kidnapping for robbery of Gribben and Gutierrez required the victims to have been "moved or made to move a distance beyond that merely incidental to the commission of a robbery" *and* the distance "must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery." Thus, CALCRIM No. 1203 apprised the jury something more than trivial movement was necessary to convict Varnado of kidnapping for robbery. Had the trial court also instructed –- as Varnado requested –- incidental movement during commission of the robbery did not automatically turn the offense into kidnapping for robbery, such additional instruction would have been redundant.

More than simply adding information about the asportation element of kidnapping for robbery, Varnado's requested pinpoint instruction would likely have confused the jury. Telling the jury that "[m]ovement can be incidental to the robbery, even if the movement is not necessary for the robbery" would unnecessarily create a categorical morass for the jury by suggesting different types of movement during a robbery, i.e., movement that is necessary to the robbery, movement that is not necessary to the robbery but incidental to the robbery, and movement incidental to the robbery. Quite simply, movement during the robbery either substantially increases the risk to the victim beyond that necessary to commit the robbery or it does not substantially increase the risk to the victim. (CALCRIM No. 1203; *People v. Delgado, supra,* 56 Cal.4th at p. 487.) This clear distinction between robbery and kidnapping for robbery would have been muddled if the defense's pinpoint instruction would have been given. Accordingly, the trial court

17

properly refused the pinpoint instruction to give CALCRIM No. 1203 to instruct on kidnapping for robbery.

## III

### *Varnado's Challenge to the Admission of Evidence at his Retrial Regarding Shots Fired at Mangano*

Varnado contends the trial court erred in admitting evidence from the first trial about shots fired at Mangano during Varnado's retrial on the offenses committed against Gutierrez and Gribben. We reject the contention.

### A.

### *Trial Court Ruling*

During Varnado's retrial, the prosecution relied on Evidence Code sections 452.5 and 1101, subdivision (b), in moving to introduce evidence Varnado had been previously convicted of the attempted robbery of Mangano. The trial court exercised its discretion under Evidence Code section 352 to exclude evidence of defendant's prior conviction. However, over the objection of defense counsel, the trial court allowed testimony Varnado had previously fired shots at Mangano as evidence of a common scheme or plan.

### B.

### *Admission of Evidence Showing Common Scheme or Plan*

Under Evidence Code section 1101, subdivision (b), the trial court may admit "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." Thus, " '[e]vidence of a common design or plan is admissible to establish that the defendant committed the act alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, "[i]n proving design, the *act* is still undetermined. . . ."

18

[Citation.]' (*People v. Ewoldt* [(1994)] 7 Cal.4th at p. [394], fn. 2, italics in original.) To establish a *common design or plan*, the evidence must demonstrate not merely a similarity in the results, but ' "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' (*Id.* at p. [393].)" (*People v. Balcom* (1994) 7 Cal.4th 414, 423-424 (*Balcom*).) "Although an uncharged offense need not possess unusual or distinctive characteristics to be relevant to establish the existence of a *common design or plan*, the presence of unusual or distinctive shared characteristics may increase the probative value of such evidence for this purpose." (*Id.* at p. 425.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (*People v. Dyer* (1988) 45 Cal.3d 26, 73.) Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

## C.

### *Common Scheme to Commit Robberies*

The crimes committed by Varnado against Gutierrez and Gribben and then against Mangano were separated by only a few hours. As the California Supreme Court has noted, a "close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence." (*Balcom, supra,* 7 Cal.4th at p. 427.) Varnado and his accomplices robbed Gutierrez and Gribben using the same car to drive up to Mangano. In both instances, the robbers used handguns.

The robberies and attempted robbery were part of the same crime escapade that focused on robbing isolated individuals late at night. As parts of the same crime spree,

19

the trial court did not err in admitting evidence of the attempted robbery of Mangano during the trial on the robbery of Gutierrez and Gribben. Thus, we reject Varnado's contention the evidence of Mangano's attempted robbery was irrelevant and unduly prejudicial. The crimes were sufficiently related in time and manner of execution to render the evidence of the Mangano attempted robbery relevant and probative. (Evid. Code, § 1101, subd. (b).)

We also reject defendant's assertion the Mangano attempted robbery provided unduly inflammatory evidence because "the perpetrators recklessly fired multiple shots at Mangano and his car even as it became clear they would be unable to stop him from fleeing." The testimony regarding the shots fired was brief and not substantially more inflammatory than the threat to kill Gutierrez while a gun was pointed at his head, or Gribben's emotional testimony about her belief she was going to die when the robbers made her get into the trunk. Evidence Code section 352 did not require exclusion of evidence regarding the Mangano attempted robbery. The Mangano attempted robbery was carried out with sufficiently similar reliance on firearms to prevent it from being more prejudicial than probative or more inflammatory than the testimony given by Gutierrez and Gribben. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [evidence of ongoing pattern warrants admission of uncharged misconduct evidence and is less likely to be unduly prejudicial as the similarity between the offenses increases].)

The trial court did not err in allowing evidence of the attempted robbery committed as part of the same crime spree as the Gutierrez and Gribben robberies for the limited purpose of showing a common scheme or plan.

**IV**

***Varnado's Argument Regarding Sufficiency of the Evidence for Attempted Robbery***

Varnado contends we must reverse his attempted robbery conviction because the evidence failed to prove he had an intent to rob Mangano or made any effort to rob him. In so arguing, Varnado concedes the evidence presented at trial showed he and his

20

accomplices pulled their vehicle in front of Mangano's car while it was parked on a rural road, and then fired shots at him as he sped away. This evidence, Varnado argues, fails to show he attempted to rob Mangano. Reviewing the record as a whole, we reject the argument.

## A.

### *Standard of Review*

As we explained in part I A., *ante*, when considering a challenge to the sufficiency of the evidence, "the court must review the *whole* record in the light most favorable to the judgment below to determine whether it discloses substantial evidence that is, evidence which is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578, italics added.)

## B.

### *Attempted Robbery*

On the charge of attempted robbery of Mangano, the People had the burden of proving "specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Cal.4th 685, 694.) Varnado contends the evidence failed to establish he had the intent to rob Mangano or he engaged in any overt act for the offense. We disagree.

As to the element of intent, Varnado concedes that "at least one or more of the occupants of the car had engaged in robberies of other victims." Varnado thus refers to evidence that the occupants of the same car that drove up to Mangano had only a few hours earlier engaged in the robberies of Gutierrez and Gribben. Although Varnado's first jury was unable to reach a verdict as to whether Varnado participated in the robbery of Gutierrez and Gribben, the evidence was sufficient for Garrett to be convicted of those robberies during the first trial. However, the evidence did show Varnado was riding in

21

the same backseat with Garrett and in the same car as two other perpetrators of the robberies of Gutierrez and Gribben only several hours after those robberies.

The evidence presented at Varnado's first trial also showed he robbed Cheatham, Kilgore, Douglas, and Cordero only three days before the incident involving Mangano. The offenses committed against Cheatham, Kilgore, Douglas, and Cordero on November 15, 2008, involved the robbers –- including Varnado –- driving up to the victims and threatening them at gunpoint in order to take their personal possessions.

The evidence of the prior robberies of Cheatham, Kilgore, Douglas, and Cordero suffced to support a conviction for attempted robbery of Mangano. The California Supreme Court has "long recognized 'that if a person acts similarly in similar situations, he [or she] probably harbors the same intent in each instance' ([*People v.*] *Thompson* [(1980)] 27 Cal.3d [303,] 319; *People v. Pendleton* (1979) 25 Cal.3d 371, 376–378; *People v. Schader* (1969) 71 Cal.2d 761, 777; [*People v.*] *Kelley* [(1967)] 66 Cal.2d 232, 242–243), and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him [or her] by the prosecution." (*People v. Robbins* (1988) 45 Cal.3d 867, 879, superseded by statute on another ground as noted in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.)

The evidence at trial showed the same plan –- to drive up to victims and rob them at gunpoint –- was employed against Mangano. The only difference from the earlier robberies is Mangano was able to escape and the robbers discharged their weapons. However, these differences do not undermine the jury's conclusion Varnado and his accomplices intended to rob Mangano. Moreover, the robbers' pulling their car in front of Mangano's and brandishing their weapons constituted overt acts toward a robbery that

22

was ineffectual solely due to the victim's ability to speed away. We conclude the evidence sufficed to show Varnado's intent to rob Mangano.

## V

### *Varnado's Challenge to Identification Procedure*

Varnado argues the suggestive nature of single-photo identifications should have disallowed testimony by the detective who, two days after the robbery, showed Gutierrez a photo of Varnado. We disagree.

### A.

### *Defendant's Burden to Establish that Identification Procedures are Unduly Suggestive*

A criminal conviction may not stand when based on identification of the perpetrator resulting from an unduly suggestive identification procedure. As the California Supreme Court has previously explained, " 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification . . . . [Citations.]' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

" '[D]efendant has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." [Citation.] A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citation.]' 'We have held that an identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness

23

should select him [or her]." [Citation.]' (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.) If the defendant fails to show that the identification procedures were unduly suggestive, we need not address any arguments regarding the identifications' reliability under the totality of the circumstances. (*People v. Cook, supra*, 40 Cal.4th at p. 1355; *People v. Cunningham, supra*, 25 Cal.4th at p. 989.)" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 271-272.) We independently review " 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.' " (*People v. Avila* (2009) 46 Cal.4th 680, 698-699, quoting *People v. Kennedy* (2005) 36 Cal.4th 595, 609.)

**B.**

***Detective Bearor's Inquiry into the Offenses during his Meeting with Gutierrez***

Detective Bearor testified he took the photos of Varnado, Garrett, Hicks, and Anderson as part of his regular routine because of "the importance of the person's appearance at the time of their arrest." Thus, Detective Bearor photographed Varnado as he appeared when Gutierrez identified him as one of the robbers only several hours after the robbery.

On November 20, 2009, two days after the robbery, Detective Bearor called Gutierrez to come to the police station to retrieve his stolen property. When he met with Gutierrez, Detective Bearor asked about the robbers' purpose in locking Gutierrez and Gribben into the trunk. Detective Bearor also asked whether Gutierrez remembered the suspects from the in-field show up, and Gutierrez replied affirmatively. Detective Bearor showed Gutierrez the photographs, and Gutierrez recognized the suspects. Upon seeing the photos, Gutierrez explained he recognized Hicks as standing near the robbers' car; Anderson was wearing a red do-rag, Varnado was armed with a western-style handgun, and Garrett was standing near the rear bumper of Gutierrez's car.

The photograph shown by Detective Bearor reflected how Varnado looked at the time Gutierrez identified him. The photograph did not change Varnado's appearance, such as by showing him dressed in jail-issued clothing, or in any other manner to suggest

24

he was one of the robbers. Detective Bearor testified he showed the photographs of the suspects to ask about how the offenses were committed –- rather than about who committed the offenses. Moreover, there is no evidence Detective Bearor expressed any opinion about whether the suspects were actually the robbers. Under these circumstances, we conclude the detective's use of Varnado's post-arrest photo was not unduly suggestive.

## VI

### *Garrett's Challenge to Identification Procedures*

Garrett also contends his convictions for robbery must be reversed because the police employed unduly suggestive procedures to allow the victims to identify him.[5] We disagree.

Garrett asserts he was identified "by means of improper and overly suggestive identification procedures." In support of his argument, Garrett describes the facts surrounding his identification by the victims and witnesses involved with the November 15, 2008, robberies. Garrett also recounts his identification by Gutierrez and Gribben for his part in the November 18, 2008, robberies. This factual recitation is followed by a general discussion of the law as it relates to the constitutional prohibition on unduly suggestive identification procedures.

With only one exception, Garrett does not explain why the facts of his identification meet the standards he describes only in generally applicable terms. His legal analysis contains only a single sentence that connects the circumstances of this case with the law. In that sentence, Garrett asserts: " 'Bolstering' is what Deputy Bearor did when he had Gutierrez come down to the station and view the photographs which Bearor had taken of the suspects as they were shown to Gutierrez and the other victims at the showup." By "bolstering," Garrett refers to a practice that "involves the refreshment of

---

[5]     Garrett does not challenge his conviction of attempted robbery of Mangano on this basis.

25

the eyewitness's memory prior to trial" so that a witness relies on the refreshed recollection rather than what he or she originally observed. We are not persuaded by Garrett's argument about bolstering, and we reject the remainder of his contentions as forfeited.

As to the claim of bolstering, Garrett refers to the actions taken by Elk Grove Police Detective Mark Bearor. Detective Bearor photographed each of the robbery suspects after the in-field show up at the Elk Grove Police Department. Although Garrett's argument cites a 1976 law review article generally decrying the vagaries of witness identifications, he cites no case requiring reversal of a criminal conviction on the basis of the "bolstering" he alleges to have occurred here. We find nothing inherently prejudicial about Detective Bearor's procedure because, as we explained in part V B., *ante*, Detective Bearor did not show the photograph of Garrett to Gutierrez for identification purposes. Instead, Detective Bearor used the photos for purposes of inquiring about the details of the robberies. Consequently, we reiterate our conclusion Detective Bearor did not engage in an unduly suggestive identification procedure.

As to any remaining points of contention on the issue of the identification procedures employed, we deem them forfeited. As this court has previously noted, "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) With the exception of his assertion about "bolstering," Garrett has not attempted to explain how the circumstances of his identification violate the constitutional prohibitions he discusses only in generalities. In effect, Garrett leaves us to connect the dots to fill in the picture. We decline to formulate the analysis for Garrett and pass on the issue without further consideration.

## VII

### *Garrett's Claim his Miranda Rights were Violated*

Garrett contends his convictions must be reversed because his custodial interrogation was coercive and violated his rights under the Fifth and Sixth Amendments. We reject the contention.

### A.

### *Miranda Advisement*

The following exchange occurred between Detective Strange and Garrett at the Elk Grove Police Department:[6]

"DET. STRANGE:  What's up Victor?  I didn't realize you still had these [handcuffs] behind your back.  (Unintelligible) get that.  Just so we're all completely clear, you realize you're in custody, right?

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Okay.  Um, at this point you're under arrest for uh – for, uh – attempted robbery –

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Okay?  And, uh, I talked to a couple of the other guys so it's not a big deal.  I mean, you guys did what you did, just kinda had a night of it, but uh – but we just wanna put everything out on the table now and just make sure you can walk out of here kinda clean-slated –- make sure there's nothing hanging over your head, okay?

"V. GARRETT:  Alright.

"DET. STRANGE:  So, um, you want water or anything?

"V. GARRETT:  Mmm yeah.

---

**6**      We quote the transcript of the interview between Detective Strange and Garrett as reflected in an exhibit submitted to the jury.  The interview was videotaped and in considering Garrett's argument, we have viewed the videotape.

"DET. STRANGE:  I'll grab one for you, okay?  Just be a second.  Be back in just a second here.  Can you grab me a water?

"(BEGIN CLIP)

"DET. STRANGE:  Okay.  I gotta go through that before I can really talk to ya, um, so we can clean the –- clean the slate for tonight, so, um.  Anything you say um –- or, sorry.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to the presence of an attorney if you want before and during any questioning and if you can't afford an attorney then one can be appointed to you free of charge.

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Do you understand all of that?

"V. GARRETT:  (Nods Head)

"DET. STRANGE:  Okay.  So, tonight obviously you guys got hemmed up.

"V. GARRETT:  Yeah.

"DET. STRANGE:  Kinda got caught red-handed.  So, what I wanna do is try to clean the slate for the whole night.

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Okay?  So, um, what I'm gonna ask of you to do is go back for the beginning of the night when you guys all got in the car and just run me through the whole night?  Okay?  Because, just so you know –- and, let's be honest, okay?  Some cops try to play tricks and things like that.  I'm not gonna do that, okay?

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  I'm gonna –- I'm gonna shut you down if I know you're telling me a lie –

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  -- so I don't even wanna deal with lies.  I'm just gonna come at you straight.  Obviously you're going to jail –- or going to juvenile hall in your case.

28

Obviously you've got some charges that are gonna be over your head and let's be honest, they're kind of significant at this point so I think the best thing we can do is just have you be honest through the whole thing because then at least it shows –- I –- in my eyes at least –- that hey, you know what?  I was an idiot tonight.  I'm sorry for what I did and I –- I'm –- I'm ready to pay the consequence of what I have to do because that's just how the world works.

"V. GARRETT:  Mm-hmm."

## B.

### *Waivers of Miranda Rights*

In *Miranda v. Arizona*, the United States Supreme Court held that "when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his [or her] right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He [or she] must be warned prior to any questioning that he [or she] has the right to remain silent, that anything he [or she] says can be used against him [or her] in a court of law, that he [or she] has the right to the presence of an attorney, and that if he [or she] cannot afford an attorney one will be appointed for him [or her] prior to any questioning if he [or she] so desires.  Opportunity to exercise these rights must be afforded to him [or her] throughout the interrogation. After such warnings have been given, and such opportunity afforded him [or her], the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him [or her]." (*Miranda v. Arizona*, *supra*, 384 U.S. at pp. 478-479.) To this end, the Supreme Court cautioned that "a valid waiver will not be presumed

29

simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." (*Id*. at p. 475.)

Nonetheless, a defendant need not expressly waive his or her *Miranda* rights in order to indicate a voluntary and uncoerced desire to answer questions posed by the police. The California Supreme Court has noted that "decisions of the United States Supreme Court and this court have held that such an express waiver is not required where a defendant's actions make clear that a waiver is intended." (*People v. Whitson* (1998) 17 Cal.4th 229, 250.) "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [130 S.Ct. at pp. 2259-2261].) "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." (*Miranda v. Arizona*, *supra*, 384 U.S. at p. 478.)

Of course, minors have the same rights under the Fifth and Sixth Amendments as do adults. (*People v. Davis* (1981) 29 Cal.3d 814, 823-825.) In *People v. Davis*, the California Supreme Court addressed the issue of custodial interrogation as it applied to a 16-year-old male who was suspected of rape and murder. (*Id.* at pp. 819, 823.) The defendant in *Davis* argued his confession was involuntary even though he had been advised of his *Miranda* rights prior to custodial questioning. (*Id.* at p. 823.) The record showed he was interviewed at a police station after being informed of his *Miranda* rights. (*Ibid.*) The defendant indicated he waived those rights and answered questions for three hours before being arrested and placed in a holding cell. (*Id.* at p. 824.) The interviewing police officer came back and asked the defendant if he wished to have dinner. After replying yes, the officer asked if defendant had killed the victim. The defendant nodded affirmatively. (*Ibid.*) While acknowledging a "sensitivity to the youth and inexperience of defendant," the Supreme Court held that "[a]lthough defendant was a minor, that fact alone does not establish that his confession was involuntary. (*People v.*

30

*Lara* (1967) 67 Cal.2d 365, 378-379.) The evidence tended to show that he was fully aware of his rights, and was not frightened into submission by the officers' behavior." (*Id.* at p. 825.) Youth thus is one of the factors to be considered in determining whether the totality of the circumstances establishes coercive questioning in derogation of the Fifth and Sixth Amendments. (*Id.* at p. 824.)

" 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra*, 384 U.S. 436 [86 S.Ct. 1602], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.' " (*People v. Kelly* (1990) 51 Cal.3d 931, 947.) Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained (*ibid.*), we " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979, quoting *Miller v. Fenton* (1985) 474 U.S. 104, 112 [106 S.Ct. 445, 450]; accord, *People v. Kelly, supra,* 51 Cal.3d at p. 947.)

## C.

### *Garrett Waived his Right to Remain Silent*

Garrett argues he did not waive his *Miranda* rights expressly or tacitly. Although he acknowledges Detective Strange gave a *Miranda* advisement, he contends the detective "raced through" the recitation to ask questions so Garrett "could 'walk out of here kinda clean-slated,' with 'nothing hanging over [his] head.' " Combined with his youth, the late hour of the questioning, and the custodial nature of the environment, Garrett asserts he was coerced into giving a confession. We are not persuaded.

As we have recounted, Detective Strange advised Garrett of his *Miranda* rights. Although Garrett asserts he did not waive his rights, the transcript and videotape show he nodded to affirm he understood his *Miranda* rights.

31

Detective Strange began the interview by clearly stating, "Just so we're all completely clear, you realize you're in custody, right?" Garrett indicated he understood. Garrett did not indicate in any way that he was fearful, did not wish to speak with the detective, or even that he was uncomfortable. Detective Strange removed Garrett's handcuffs and offered him a bottle of water.

Not until the detective had given the *Miranda* advisement and told Garrett he was going to go to jail or juvenile hall anyway did Detective Strange begin to ask about the events of the evening that led to the arrest. Detective Strange did not attempt to elicit answers with the promise of leniency. Instead, he advised Garrett to simply "pay the consequence" of having been "an idiot" that evening. Thus, the record shows the detective indicated Garrett's answers would have adverse consequences.

Garrett argues that "Detective Strange resorted to vague half-truths and half-lies by telling [him] the situation was 'no big deal' and that he was 'obviously' going to juvenile hall as the result of his actions." Garrett's argument takes Detective Strange's statements out of context. The detective informed Garrett: "Obviously you're going to jail –- or going to juvenile hall in your case. Obviously you've got some charges that are gonna be over your head and let's be honest, they're kind of significant at this point." Detective Strange told Garrett he "[k]inda got caught red-handed." Moreover, the detective indicated Garrett's statement was not even necessary because he had "talked to a couple of the other guys so it's not a big deal." Contrary to Garrett's assertion on appeal, the context of Detective Strange's comment made clear it was "not a big deal" to add to the other statements given by Garrett's co-conspirators. The detective did not state or imply Garrett's situation or the evidence against him was "not a big deal." Instead, Detective Strange several times expressed Garrett faced very serious charges after being caught "red-handed."

Detective Strange did not badger or yell at Garrett. And, the questioning was not protracted. Although the hour may have been late and the questions posed at the police

station, we conclude these factors did not transform Detective Strange's questioning into an exercise in coercion.

We also conclude Garrett's youth did not render ineffective his waiver of his *Miranda* rights. In so concluding, we recognize "a child's age properly informs the *Miranda* custody analysis." (*J.D.B. v. North Carolina* (2011) ___ U.S. ___ [131 S.Ct. 2394, 2399].) In *J.D.B.*, the United States Supreme Court "observed that children 'generally are less mature and responsible than adults,' [citation]; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [citation]; that they 'are more vulnerable or susceptible to . . . outside pressures' than adults [citation]; and so on." (*Id.* at p. __ [2403].)

Garrett was 17 years and 2 months old at the time of his questioning. Thus, Garrett was only 10 months away from becoming an adult. Detective Strange was aware of Garrett's age, as noted by his reference to juvenile hall. In this context, the transcript shows the detective amplified the *Miranda* advisement with clear and plain language explaining Garrett was going to juvenile hall or jail, was facing very serious charges, had been caught "red-handed," and would suffer the consequences of his actions. The detective's statements admonished Garrett in an age-appropriate manner and Garrett voluntarily chose to answer the questions posed to him.

In view of the totality of the circumstances of Garrett's questioning by Detective Strange, we conclude Garrett's rights under the Fifth and Sixth Amendments were not violated.

## VIII

### *Garrett's Eighth Amendment Challenge to his Sentence*

Garrett contends his sentence of 74 years and 4 months to life in prison for non-homicide crimes committed as a minor constitutes cruel and unusual punishment under

the Eighth Amendment.[7]  Prior to oral argument, we asked the parties for supplemental briefing to address the impact of the California Supreme Court's decision in *Caballero*, *supra*, 55 Cal.4th 262.  Garrett reiterated his contention that his sentence is unconstitutional, and the Attorney General conceded the point.  At oral argument, the Attorney General withdrew her concession and requested the opportunity to further brief the matter in light of the recent passage of Senate Bill No. 260 (2013-2014 Reg. Sess.) Statutes 2013, chapter 312.  (Senate Bill No. 260.)  We granted all parties the opportunity to file supplemental letter briefs, which were filed by Garrett and the Attorney General. Having reviewed the supplemental briefs, we conclude Garrett's sentence must be reversed and his matter be remanded for reconsideration in light of our Supreme Court's guidance in *Caballero* even after the passage of Senate Bill No. 260 (2013-2014 Reg. Sess.).

### A.

### *Life Sentences for Non-Homicide Crimes Committed by Minors*

In *Graham v. Florida* (2010) 560 U.S. 48, 81 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court announced that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.  A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."  (560 U.S. 43 at p. 81 [130 S.Ct. at p. 2034].) Two years later, in *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455] (*Miller*), the Supreme Court declared, " '[j]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his [or her]

---

[7]  Varnado does not raise an Eighth Amendment challenge to his sentence, presumably because his sentence of 31 years to life in prison allows him the possibility of parole when he will be approximately 48 years old.

culpability." (*Id*. at p. ___ [132 S.Ct. at p. 2467], quoting *Eddings v. Oklahoma* (1982) 455 U.S. 104, 116, [102 S.Ct. 869].) The *Miller* court recognized it "imposed a categorical ban on the sentence's use, in a way unprecedented for a term of imprisonment. See [*Graham, supra,*] 130 S.Ct., at 2046 (THOMAS, J., dissenting) ('For the first time in its history, the Court declares an entire class of offenders immune from a noncapital sentence using the categorical approach it previously reserved for death penalty cases alone')." (*Miller, supra*, at p. ___ [132 S.Ct. at pp. 2466-2467].)

Following *Graham* and *Miller*, the California Supreme Court held a 110-year-to-life sentence imposed for three counts of attempted murder committed as a minor constituted cruel and unusual punishment. (*Caballero*, *supra,* 55 Cal.4th at p. 265.) As the *Caballero* court explained, "the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.' (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at pp. 2029–2030].) The court observed that a life without parole sentence is particularly harsh for a juvenile offender who 'will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender.' (*Id*. at p. ___ [130 S.Ct. at p. 2028].) *Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society. (*Ibid*.)" (*Caballero*, *supra*, 55 Cal.4th at p. 266.)

In *Caballero*, the Attorney General argued the 110-year-to-life prison sentence for a minor did not violate the Eighth Amendment even though it was the "functional equivalent to a life without parole term" on grounds no individual component of the defendant's sentence by itself amounted to a life sentence. (*Caballero*, *supra*, 55 Cal.4th at p. 271.) Our Supreme Court rejected the contention because "the purported distinction between a single sentence of life without parole and one of component parts adding up to

110 years to life is unpersuasive." (*Id.* at pp. 271-272.) Thus, the *Caballero* court reversed the sentence and instructed that "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' " (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. 43 at p. 74.)

**B.**

### *Garrett's Sentence is the Functional Equivalent of a Life Sentence without Parole*

In sentencing Garrett, the trial court relied on the probation officer's report. Although the probation officer's report states Garrett was 17 at the time of the offenses, it does not consider his mental or emotional development either as it related to his culpability or the appropriate sentence for his crimes. The trial court stated that "it is, I think, a tragedy that someone as young as yourself . . . is involved in this situation." However, the trial court did not take into account the factors of mental and emotional maturity articulated by the *Graham* and *Miller* courts in imposing its sentence on Garrett.

At the time of his sentencing, Garrett was 19 years old. With approximately 2.5 years of presentence custody credits, Garrett's sentence would have made him eligible for parole at about 90 years of age. At the age of 90, Garrett will have little opportunity to become a contributing member of society.[8] (*Caballero*, *supra*, 55 Cal.4th at p. 266.) This sentence constitutes the functional equivalent of a life-without-parole term.

---

[8] Even with the 15 percent "good time" credits provided by section 2933.1, Garrett will not become eligible for parole until after he turns 82 years of age. (See § 667.5,

36

**Senate Bill No. 260** (2013-2014 Reg. Sess.) *Does Not Cure the Constitutional Error in Sentencing*

The Legislature responded to *Miller, supra,* __ U.S. __ [132 S.Ct. 2455] and *Caballero, supra,* 5 Cal. 4th 262 by passing Senate Bill No. 260 (2013-2014 Reg. Sess.), which became effective on January 1, 2014. The Legislature noted the bill "recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Sen. Bill No. 260, § 1 (2013-2014 Reg. Sess.).) The Legislature declared, "[t]he purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*], and [*Miller*]. It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Sen. Bill No. 260, § 1 (2013-2014 Reg. Sess.).)

To effectuate the Legislature's intent, Senate Bill No. 260 (2013-2014 Reg. Sess.) added section 3051 to the Penal Code, which requires the Board of Parole Hearings to conduct youth offender parole hearings during the 15th, 20th, or 25th year of incarceration. (§ 3051, subd. (b).) A youthful offender whose sentence is a term of 25 years to life or greater is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory

subd. (c)(9) [including robbery among violent felonies for which custody credits are limited under section 2933.1, subdivision (a)].)

provisions." (§ 3051, subd. (b)(3); Sen. Bill No. 260, § 4 (2013-2014 Reg. Sess.).) In conducting youth offender parole hearings under section 3051, the Board of Parole Hearings is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) If the youthful offender is found suitable for parole by the Board of Parole Hearings, he or she must be released even if the full determinate term originally imposed has not yet be completed. (§ 3046, subd. (c).)

In light of Garrett's newly enacted entitlement to a youth offender parole hearing during his 25th year of incarceration, the Attorney General argues Garrett's sentence "is constitutional because he now has a realistic opportunity to obtain release from prison during his lifetime." We conclude remand for resentencing is compelled by the Eighth Amendment.

In *Caballero*, the California Supreme Court concluded: "Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham's* nonhomicide ruling, *the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life*, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, italics added.)

Even though Senate Bill No. 260 (2013-2014 Reg. Sess.) provides what may be considered a "safety net" providing a juvenile offender the opportunity for a parole hearing during his or her lifetime, the new legislation does not substitute for the

sentencing court's consideration of all individual characteristics of the offender. In *Miller*, the United States Supreme Court held imposition of punishment for crimes committed as a juvenile constitutes a task "demanding individualized sentencing . . . ." (*Miller, supra,* ___ U.S. at p. ___ [132 S.Ct. at p. 2467].) After noting its earlier decisions requiring consideration of the mitigating and aggravating factors unique to each case of sentencing for crimes committed as a minor, the *Miller* court emphasized that, "[o]f special pertinence here, we insisted in these rulings that *a sentencer have the ability to consider the 'mitigating qualities of youth.' *" (*Id*. at p. ___ [132 S.Ct. 2455, 2467], quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367, italics added.) Consequently, Senate Bill No. 260 does not render Garrett's claim moot.

We are aware of a contrary conclusion reached in *People v. Gonzalez* (2014) 225 Cal.App.4th 1296, 1311 (*Gonzalez*). *Gonzalez* involved a youthful offender who was sentenced to serve 50 years to life in prison. (*Id.* at p. 1302.) The *Gonzalez* court relied on Senate Bill No. 260 (2013-2014 Reg. Sess.) in rejecting the defendant's argument his sentence constituted cruel and unusual punishment. (*Id.* at pp. 1300-1301.) The *Gonzalez* court concluded that "[Senate Bill No.] 260 . . . cured or rendered moot any error under *Miller* in the sentencing hearing Gonzalez received." (*Id.* at p. 1312.) *Gonzalez* further concludes the "incarceration, although lengthy and under a mandatory sentence, does not implicate *Miller's* per se ban on mandatory [life imprisonment without possibility of parole (LWOP)] terms for juveniles. He similarly falls outside *Caballero's* holding that de facto LWOP terms may be tantamount to an LWOP for constitutional purposes. Simply put, under the new legislation, Gonzalez does not face the prospect of [serving life in prison without the possibility of parole]. Therefore, *Miller* does not apply, and neither does *Caballero's* recognition that a lengthy term of years may amount to an LWOP sentence." (*Gonzalez*, at p. 1309.)

We disagree with *Gonzalez* because the penalty selection that comports with *Miller* and *Caballero* must be undertaken in the first instance by the sentencing court.

39

(*Miller*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2467]; *Caballero*, *supra*, 55 Cal.4th at p. 268-269.) Regardless of whether the new statutory scheme enacted by Senate Bill No. 260 (2013-2014 Reg. Sess.) may eventually convert a mandatory life sentence to one with possibility of parole, the United States and California Supreme Courts have clearly required the sentencing court to consider the factors of youth and maturity *when selecting the initial punishment*. The statutory promise to have a future parole board review an improperly considered sentence does not cure the constitutional error.

The possibility that Garrett will have a board of parole undertake an evaluation 25 years after his sentencing is not a substitute for the trial court's evaluation at sentencing. Although the trial court is not required to articulate the analysis of *Miller, supra,* ___ U.S. __ [132 S.Ct. 2455]*, Graham, supra,* 560 U.S. 48*,* and *Caballero, supra,* 55 Cal.4th 262 as it relates to every youthful offender, each youthful offender is entitled to a sentence that passes muster under the Eighth Amendment. Moreover, a properly imposed sentence by itself can prove instructive in indicating the trial court's conclusions about the youthful offender's level of development, culpability, and other relevant factors. When youthful offenders must ultimately show achievement of sufficient growth and maturity to secure release on parole, they will need to refer back to the circumstances that existed at the commission of the crimes and were apparent to the trial court at sentencing. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.) Without a proper evaluation by the trial court, youthful offenders will be deprived of their constitutionally guaranteed evaluation at the time of their sentencing and again when attempting to meet their burden during the much later youth parole hearings. (*Ibid.*) Consequently, we adhere to the guidance of the United States and California Supreme Courts that the sentencing court must engage in the proper evaluation of the appropriate punishment for a youthful offender. (*Miller*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2467]; *Caballero*, *supra*, 55 Cal.4th at p. 268-269.)

The question of whether remand for resentencing must be ordered in this case is additionally informed by the California Supreme Court's recent examination of

40

constitutionally deficient sentencing for youthful offenders in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). *Gutierrez* involved consolidated cases in which two defendants, Gutierrez and Moffett, each separately committed special circumstance murder while 17 years old. (*Id.* at p. 1360.) The trial courts imposed LWOP sentences on each defendant under section 190.5, subdivision (b), which had been construed to create a presumption in favor of LWOP sentences for special circumstance murders committed by 16- and 17-year-old offenders. (*Ibid.*) In *Gutierrez*, the California Supreme Court harmonized section 190.5, subdivision (b), with Eighth Amendment protections by holding trial courts have discretion to sentence a youthful offender to serve 25 years to life or LWOP with no presumption in favor of the LWOP option. (*Id.* at pp. 1371-1379.)

Because the defendants in *Gutierrez* had been sentenced under the prior, prevailing presumption in favor of LWOP, the Supreme Court held that resentencing was required. (58 Cal.4th at pp. 1361, 1379.) In so holding, the *Gutierrez* court rejected the Attorney General's argument that the recent enactment of section 1170, subdivision (d)(2), "removes life without parole sentences for juvenile offenders from the ambit of *Miller's* concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez, supra,* 58 Cal.4th at p. 1386.) Section 1170 allows a youthful offender to petition the court to recall the sentence after serving 15 years. (*Id.* at p. 1384 [noting also that the youthful offender, if not initially successful, may petition again after 20 and 24 years have been served].) The *Gutierrez* court explained that the United States Supreme Court in "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for—'*making the judgment at the outset that those offenders never will be fit to reenter society.*' (*Graham*, at p. 75 [130 S.Ct. at p. 2011], italics added.) Likewise, *Miller's* 'cf.' citation to the 'meaningful opportunity' language in *Graham* occurred in the context of prohibiting 'imposition of that harshest

prison sentence' on juveniles under a mandatory scheme. (*Miller*, at p. __ [132 S.Ct. at p. 2469].) Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' (*Graham*, at p. 75 [130 S.Ct. at p. 2011].) [¶] Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance: 'Even if the State's judgment that *Graham* was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset.*' (*Graham, supra*, 560 U.S. at p. 73 [130 S.Ct. at p. 2011], italics added.) By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to section 1170(d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous. Consistent with *Graham*, *Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2471], italics added; see *id*. at pp. ___, [132 S.Ct. at pp. 2469, 2475].)" (*Gutierrez, supra*, at pp. 1386-1387.) In short, the California Supreme Court recognized a statutory promise of future correction of a presently unconstitutional sentence does not alleviate the need to remand for resentencing that comports with the Eighth Amendment.

Consequently, we reverse and remand "the case to the trial court with directions to resentence defendant to a term that does not violate his constitutional rights, that is, a sentence that, although undoubtedly lengthy, provides him with a 'meaningful

opportunity to obtain release based on demonstrated maturity and rehabilitation.'

(*Graham*, 560 U.S. at p. ___ [130 S.Ct. at p. 2030].)" (*Caballero*, *supra*, 55 Cal.4th at

p. 273 [Werdegar, J., conc.].)

DISPOSITION

The judgment is affirmed as to Erion Demonta Varnado. We also affirm the

convictions as to Victor Tyrone Garrett. However, we reverse the judgment as to Garrett

and remand for resentencing consistent with *People v. Caballero*, *supra*, 55 Cal.4th 262.


                                                      HOCH    , J.


We concur:


      HULL    , Acting P. J.


      ROBIE    , J.